1   Daniel Demissie

2   142 S Tennessee Ave, Apt 27

3   Atlantic City, NJ 08401

4   Telephone: 202-230-4537

5   Email: ddadconsult@yahoo.com

6   Pro se Plaintiff

7

8                    **UNITED STATES DISTRICT COURT**

9                         **DISTRICT OF NEVADA**

10

11  Daniel Demissie

12       Plaintiff,                          Case No.: 2:25-cv-00504-JAD-EJY

13       V.

14  Aaron D. Ford, Attorney General of Nevada,        **FIRST AMENDED**

15  Las Vegas Metropolitan Police Department (Metro),   **COMPLAINT**

16  Detective Gabriel Lea (#16511),

17  Detective Brooks West (#16134),              **JURY DEMANDED**

18  Caesars Entertainment, Inc.,

19  Flamingo Las Vegas Operating Company, LLC, and

20  John Doe, Flamingo Assistant Security Shift Manager

21       Defendants,

22

23

24

25



1

**TABLE OF CONTENTS**

INTRODUCTION  ………………………………………………………………… 5

JURIDICTION AND VENUE  …………………………………………………….7

PARTIES  ……………………………………………………………………… …7

FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS  ……………………9

    Plaintiff's visit to the Flamingo Las Vegas Hotel and Casino  ……………………9

    Plaintiff's First Interaction with Defendants Lea and West  …………………….11

    Plaintiff's Time in Custody  ………………………………………………….16

    Preliminary Hearing: February 13, 2024  ………………………………………17

    Detective Lea's Deliberate Fabrication of Evidence Through a Perjured Affidavit  18

    Detective Lea's Deliberate Omission of Material Facts ………………………….21

    Defendant Detectives' Reckless Disregard for the Truth and False Statements to

    Flamingo Employees  …………………………………………………………22

    Plaintiff's Play History at Caesars Entertainment Inc. Casinos  ……………… 23

    Checking Slot Machines for Progressive Bonuses and Jackpots  ……………… 24

    Norms, Practices, and the Reality of Playing Slot Machines in Casinos, Including at

    the Flamingo  ………………………………………………………………… 25

    **The Flamingo:** Profiting from Abandoned Slot Machine Tickets

    at the Expense of Casino Players' Rights  ……………………………………… 26

    **The Challenged Revised Statute of Nevada:**

    Unconstitutionality of NRS 465.070(3) as Applied to TITO (Ticket In, Ticket Out)

    Slot Machine Technology Due to Vagueness and Arbitrary Enforcement  ……… 27

    Clark County "Order-Out Corridor" Ordinance (Chapter 12.02.020)  ………… 31

1

**FIRST COUNT**

2

Deliberate Fabrication of Evidence

3

42 U.S.C. § 1983—Fourteenth Amendment—Due Process   ……………………… 32

4

**SECOND COUNT**

5

Deprivation of a Protected Liberty Interest (Stigma Plus)

6

42 U.S.C. § 1983—Fourteenth Amendment—Due Process   …………………….…38

7

**THIRD COUNT**

8

Malicious Prosecution

9

42 U.S.C. § 1983—Fourth and Fourteenth Amendments   ………………….……..43

10

**FOURTH COUNT**

11

Unreasonable Search and Seizure

12

42 U.S.C. § 1983—Fourth and Fourteenth Amendments;

13

Article 1, Section 18 of the Nevada Constitution   ……………………………… 45

14

**FIFTH COUNT**

15

42 U.S.C. § 1983 – Monell Claim

16

Municipal Liability for Policies, Customs, and Practices   ……………………… 48

17

**SIXTH COUNT**

18

42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights   ……………........... 51

19

**SEVENTH COUNT**

20

Equal Protection Violation (Class of One)

21

42 U.S.C. § 1983 – Fourteenth Amendment   ………………………………… 55

22

**EIGHTH COUNT**

Excessive Force

42 U.S.C. § 1983 – Fourth and Fourteenth Amendments    ………………………….58

**NINTH COUNT**

Failure to Intervene

42 U.S.C. § 1983 – Fourth and Fourteenth Amendments    ………………………….59

**TENTH COUNT**

Defamation Per Se – Nevada State Law    …………………………………………….60

**ELEVENTH COUNT**

Premises Liability – Nevada State Law    ……………………………………….….......64

**TWELFTH COUNT**

Intentional Infliction of Emotional Distress – Nevada State Law    …………………........66

**THIRTEENTH COUNT**

Civil Conspiracy – Under Nevada State law    ……………………………………… 68

**FOURTEENTH COUNT**

False Arrest – Nevada State Law    …………………………………………….….. 69

**FIFTEENTH COUNT**

Battery – Nevada State Law    ………………………………………………………. 71

PRAYER FOR RELIEF    …………………………………………………….…..... 72

Plaintiff's Submission of Evidence in Support of Complaint    ……………………… 74

Plaintiff's Demand for Trial by Jury    ……………………………………….…….. 75

4

Now comes Plaintiff DANIEL DEMISSIE, proceeding pro se, brings this Complaint for damages and seeking injunctive and declaratory relief under 42 U.S.C. § 1983 (Civil Action for Deprivation of Rights) as well as state law tort claims under Nevada law.

## Introduction

1. Plaintiff Daniel Demissie was wrongfully arrested and charged with a crime he did not commit due to the egregious misconduct of Defendant Detectives Gabriel Lea and Brooks West (hereafter referred to as the "Defendant Detectives").

2. Defendant Lea knowingly filed a perjured arrest affidavit, falsifying statements and omitting critical facts about the circumstances of Plaintiff's arrest.

3. In addition to these deliberate fabrications, Defendant Lea ignored key facts that clearly negated any reasonable suspicion of criminal activity. Through these actions, he created a false pretense of probable cause to support an unwarranted arrest.

4. Without Defendant Lea's fabrications, there would have been no basis to charge Plaintiff with a crime or establish probable cause for his arrest.

5. As a result of this egregious misconduct, Plaintiff was unjustly detained for 30 hours on Father's Day, subjected to a court-imposed "order out corridor" barring him from the Las Vegas Strip for nearly eight months by the Clark County Justice Court in Las Vegas, Nevada.

6. Subsequently, Plaintiff was wrongfully added to a criminal database maintained by the court.

7. This database, reserved mostly for chronic and repeat offenders associated with drug and prostitution offenses, is accessed by Metro and other public safety departments.

**8.** Plaintiff's inclusion in the database triggered an unprecedented federal law enforcement operation involving 24/7 surveillance, daily drug sting operations targeting Plaintiff, and persistent attempts at entrapment designed to incriminate him.

9. In a surreal, stranger-than-fiction ordeal, Plaintiff was portrayed as a high-profile drug dealer freely roaming the streets while agents pursued him for months, still waiting for him to sell them drugs.

10. Over the past seventeen months, based on observation and belief, at least 30,000 undercover agents, informants, and others have been involved in the operation, which remains ongoing.

11. Upon information and belief, a federal law enforcement agency, armed with false information and animosity, wrongly convinced that Plaintiff was an offender, intercepted and accessed Plaintiff's notice of claim letter to Metro before returning it to its intended destination.

12. Already a victim of fabricated evidence and aware of the stigma from his wrongful inclusion in the criminal database, Plaintiff lives in constant fear that rogue agents may plant evidence or make false accusations to wrongfully implicate him in criminal activity.

13. Plaintiff's wrongful inclusion in the criminal database, without due process and compounded by Defendant Lea's false statements, caused lasting harm beyond reputational damage.

14. The Defendants are jointly and severally liable for the harm caused to Plaintiff, as their collective actions and misconduct directly caused Plaintiff's injuries.

15. Plaintiff seeks full compensation for these injuries, punitive damages, declaratory and injunctive relief to prevent such misconduct in the future.

**Jurisdiction and Venue**

16. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 (Federal Question Jurisdiction) and 28 U.S.C. § 1343(a)(3)-(4) (Civil Rights Jurisdiction).

17. The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367.

18. Declaratory relief is sought pursuant to 28 U.S.C. § 2201 (Creation of Remedy).

19. Joinder of Defendants is proper under Rule 20(a)(2) of the Federal Rules of Civil Procedure, as the claims arise from the same transaction or occurrence and involve common questions of law and fact, including whether Plaintiff's constitutional rights were violated.

20. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred within this district.

**Parties**

21. **Plaintiff Daniel Demissie** is a professional cash poker player with 19 years of experience, residing in Atlantic City, New Jersey.

22. Plaintiff could have pursued other professional careers but deliberately chose to be a poker player.

23. Plaintiff has built a reputation for integrity and established a strong network within the poker and casino communities.

24. His false arrest, defamatory charge, and wrongful inclusion in the offenders' database have severely damaged his reputation and impaired his ability to continue his career.

25. **Defendant Aaron D. Ford, Attorney General of the State of Nevada**

Defendant Aaron D. Ford is sued in his official capacity as the chief legal officer of Nevada, responsible for enforcing and defending the constitutionality of state laws. This action seeks declaratory and injunctive relief to prevent the enforcement of NRS 465.070(3), which violates Plaintiff's constitutional rights.

26. **Defendant Las Vegas Metropolitan Police Department ("Metro")**

Metro is a political subdivision of Nevada with the capacity to be sued. It employed Defendants Gabriel Lea and Brooks West and is liable for their state law torts under respondeat superior. Metro is also responsible for its own policies, practices, customs, and inaction.

27. **Defendant Detective Gabriel Lea (#16511), in his individual capacity**

Upon information and belief, Defendant Gabriel Lea ("Defendant Lea") was a peace officer employed by Metro at all relevant times and currently serves as a detective.

28. **Defendant Detective Brooks West (#16134), in his individual capacity**

Upon information and belief, Defendant Brooks West ("Defendant West") was a peace officer employed by Metro at all relevant times and currently serves as a detective.

29. **Defendant Caesars Entertainment, Inc. ("Caesars")**

Caesars is a Delaware corporation headquartered in Nevada. It owns and operates the Flamingo Las Vegas Hotel and Casino through its subsidiary, Flamingo Las Vegas Operating Company, LLC ("FLVOC"). As the parent company, Caesars exercises significant control over the Flamingo's operations, including strategic decision-making and policy implementation.

30. **Defendant Flamingo Las Vegas Operating Company, LLC ("FLVOC")**

FLVOC is a Nevada Limited-Liability Company that operates the Flamingo Las Vegas Hotel and Casino. As the operating entity, it is responsible for the casino's day-to-day management, including the employment of its staff. FLVOC is a wholly owned subsidiary of Caesars Entertainment, Inc.

31. **Defendant John Doe, Assistant Security Shift Manager of the Flamingo**

Plaintiff sues "John Doe" as a placeholder for the Assistant Security Shift Manager of the Flamingo at the time of Plaintiff's arrest. Plaintiff is currently unaware of the true names and roles of other relevant Flamingo employees and will seek leave to amend this Complaint upon identification. For now, all references to "Flamingo employees" include "John Doe."

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

**Plaintiff's visit to the Flamingo Las Vegas Hotel and Casino**

32. Plaintiff visited the Flamingo Las Vegas Hotel and Casino (hereafter "Flamingo"), located at 3555 Las Vegas Blvd S, Las Vegas, NV 89109, on June 17, 2023, around 8:30 PM.

33. Upon arrival, Plaintiff explored the bonus slot machines near the craps table and observed unused credit balances on two Regal Riches machines but did not take the credits.

34. Plaintiff began playing with a $5 wager on an electronic craps machine.

35. After a few rolls, Plaintiff cashed out the winnings and moved to the Wheel of Fortune Wild Spin game.

36. Plaintiff lost $8 on two $4 wager spins.

37. He then cashed out without noting the exact ticket amount, which is consistent with his usual practice.

38. As a result, he does not recall the amount.

39. Plaintiff returned to the electronic craps machine for a few rolls and then cashed out without recalling the exact amount.

40. He then placed a single $0.50 wager on Ultra Gold Rush before cashing out.

41. Plaintiff observed another individual seated at the Wheel of Fortune Wild Spin game, the same machine on which he had previously lost $8.

42. Plaintiff then waited for the individual to leave, hoping to find a better wild setup.

43. This game is popular among advantage slot players, a fact known to security at the Flamingo.

44. While waiting, Plaintiff could not determine whether the individual was an advantage player or a recreational player, as the individual was seated but not actively playing.

45. When the individual left, Plaintiff took a seat, inserted his TITO ticket, and checked each denomination for a favorable setup.

46. Plaintiff did not like the position of the wild symbols.

47. After considering whether to continue playing, Plaintiff decided to cash out, puzzled by the previous player's long stay on the machine, which led Plaintiff to believe there was a more favorable setup.

48. Plaintiff then immediately returned to the electronic craps machine, less than 20 feet away, played two rolls, and cashed out again without noting the exact value of the ticket.

49. Plaintiff initially left the Wheel of Fortune machine, uncertain about the favorability of its wild setup.

50. After briefly playing two rolls on the electronic craps machine, Plaintiff reconsidered and returned to the Wheel of Fortune Wild Spin machine within 90 seconds.

51. Upon his return, however, he found the same individual who had previously vacated the machine occupying it again.

52. Plaintiff waited briefly in hopes of securing the machine.

53. Plaintiff ultimately walked away to explore other bonus-feature machines.

54. While Plaintiff was evaluating the progressive meter of a Prosperity Pearl slot machine, defendants Gabriel Lea and Brooks West approached him.

**Plaintiff's First Interaction with Defendants Lea and West**

55. Defendant Detectives approached Plaintiff.

56. Defendant Lea then asked Plaintiff what he was doing.

57. Plaintiff explained that he was changing the denomination buttons to view the wild progressives available at each bet level.

1    58. Without further questioning, Defendant West immediately grabbed Plaintiff's arm and

2        led him about six feet away from the machine.

3    59. Defendant West then ordered Plaintiff to put his arms behind his back.

4    60. Plaintiff complied while asking what he had done wrong.

5    61. Defendant West began to cuff Plaintiff.

6    62. Plaintiff asked, "What did I do?" Neither defendant provided an answer.

7    63. While Defendant West was placing the handcuffs, Defendant Lea stood in front of

8        Plaintiff.

9    64.  Defendant Lea asked if Plaintiff had ever been arrested before.

10   65. Plaintiff replied, "No."

11   66. Defendant Lea then stated, "Tonight you are going to jail."

12   67. Plaintiff asked again, "What did I do?"

13   68.  But neither defendant explained the reason for the detention.

14   69. Throughout the encounter, Plaintiff did not resist arrest, attempt to flee, or pose any

15       threat.

16   70. Despite being confused about the reasons for his detention, Plaintiff remained polite

17       and compliant, answering their questions calmly.

18   71. Plaintiff was wearing a thin, nearly see-through T-shirt and shorts, showing that he

19       was not concealing anything that could pose a threat to the defendants or others.

20   72. He was not carrying any bags, and his hands were visible and free.

21   73. Both defendants were physically larger than Plaintiff.

22   74. At least ten other peace officers were present on the Flamingo casino floor.

75. Additionally, 400 officers were stationed nearby along Las Vegas Boulevard for the Golden Knights hockey team parade.

76. Defendant Lea asked Plaintiff for ID.

77. Plaintiff informed him that it was in his pocket.

78. Defendant Lea then proceeded to pat Plaintiff down while he was handcuffed.

79. He also asked Plaintiff if he had anything on him that could harm them.

80. Plaintiff responded, "No."

81. Defendant Lea then asked if he could search Plaintiff's pockets for any weapons.

82. Under duress and confused, Plaintiff consented, feeling he could not refuse.

83. Neither Defendants informed him of his right to refuse the search.

84. Defendant Lea retrieved Plaintiff's wallet and ID.

85. Defendant Lea then began searching Plaintiff's pockets.

86. During the search, Defendant Lea found eight TITO tickets, each from a different casino, printed at various times and dates.

87. The TITO ticket from the Flamingo was valued at around seven dollars.

88. Plaintiff does not recall the exact amounts of the other seven TITO tickets, but all were valued under one dollar each.

89. The issuing casino names were printed in bold on the TITO tickets, along with the time and date of issuance, making them easily identifiable.

90. Each TITO ticket contained a barcode that could verify the rightful owner.

91. Plaintiff informed Defendant Detectives that the TITO tickets were his.

92. He explained that he had been playing at those casinos and had kept the tickets in his pocket after losing money.

93. He also informed them that he possessed a Seven Stars companion card, the highest Players loyalty card at Caesars Entertainment Casinos.

94. Defendant Detectives then began escorting Plaintiff through the casino to the back room, as casino guests observed and some recorded the incident.

95. On the way, the John Doe Assistant Security Shift Manager from the Flamingo arrived.

96. Defendant Lea asked if they knew Plaintiff.

97. The John Doe responded, "No."

98. Defendant Lea then ask if Plaintiff was a regular player.

99. The John Doe again replied, "No."

100.    Defendant Lea handed Plaintiff's Seven Stars companion card to John Doe.

101.    Defendant Lea then said, "Check him out."

102.    Upon entering the back room, Defendant West read Plaintiff his Miranda rights.

103.    He explicitly said that this was not an arrest, but a detention until they could determine what had occurred.

104.    Defendant Lea left the room, leaving Defendant West and Plaintiff alone.

105.    Plaintiff remained handcuffed during this time.

106.    Plaintiff asked Defendant West multiple times to make a phone call or radio communication to verify that Plaintiff was the rightful owner of the tickets from the casinos.

107.    Defendant West refused.

108.     Plaintiff also explained that the TITO tickets were small in value and that he had not cashed them because he did not need the money.

109.     Defendant West insisted the amount was significant sum.

110.     Defendant Lea returned and said to Defendant West, "They got nothing on him."

111.     He was referring to Plaintiff's criminal history.

112.     Defendant Lea then stated to Defendant West, "I think he just got fucked up."

113.     Plaintiff tried again to explain to Defendant Lea that all the TITO tickets were his and what he had been doing.

114.     Defendant Lea yelled at Plaintiff, "Stop talking."

115.     He gestured with his hands to silence him.

116.     Afterward, the John Doe returned to the back room and told Defendants Lea and West, "Plaintiff is a local Diamond player from Atlantic City and is staying at Harrah's Casino."

117.     Then, both Defendant Lea and John Doe left the room.

118.     After a while, both Defendant Lea and the John Doe returned to the back room together.

119.     The John Doe read Plaintiff a trespass notice without giving any reason.

120.     He stated that if Plaintiff ever returned to the Flamingo property, he would be arrested.

121.     The John Doe told Plaintiff, while both Defendants Lea and West were listening, "We don't want someone like you here at the Flamingo," without giving any reason.

122.    He continued, saying, "I don't know why Harrah's would want someone like you," without offering any reasons why they shouldn't.

123.    He then turned to Defendants Lea and West and said, "It's up to you guys."

124.    This implied that they could arrest Plaintiff if they chose to.

125.    Defendant Lea then immediately grabbed Plaintiff's arm and led him to the back door for transport to jail.

126.    While handcuffed on the curb, Plaintiff told Defendant Lea that he must not like him for some reason.

127.    Defendant Lea did not respond.

128.    Plaintiff reiterated that he was pressing the denomination buttons to explore different bonus games.

129.    Defendant Lea claimed it was illegal in Nevada but did not refer to any law or statute supporting his claim.

130.    Defendant Lea then handed Plaintiff over to other officers for transport to jail and returned to the Flamingo.


**Plaintiff's Time in Custody**

131.    The plaintiff was handcuffed from detention at the Flamingo until booking at the Clark County Detention Center (CCDC).

132.    This process took nearly three hours due to a high number of arrestees.

133.    On June 17, 2023, the night of the Golden Knights hockey team parade on the Strip, Metro made a significant number of arrests.

134.    Most charges were dismissed before court, and others were dropped at the initial appearance.

135.    While waiting for transport, the plaintiff was placed in a van without air conditioning and endured excessive heat for about 30 minutes.

136.    Plaintiff was placed in an uncomfortably cold cell, unsuitable for Las Vegas summer attire.

137.    The plaintiff remained in custody for 30 hours on Father's Day.

138.    On June 19, 2023, at 2:30 a.m., the plaintiff was released on his own recognizance.

139.    He was given an order to appear for an arraignment on July 14, 2023.

140.    Prior to his release, the Clark County Nevada Justice Court, through Judge Wong, issued an "order out corridor," barring the plaintiff from the Las Vegas Strip and its casinos until further notice.

141.    The order warned that crossing this boundary would result in arrest.

142.    The plaintiff was only allowed to return to Harrah's Las Vegas Hotel and Casino to collect his belongings and leave the area immediately.

**Preliminary Hearing: February 13, 2024**

143.    On February 13, 2024, at the scheduled preliminary hearing, the DA's office, represented by Glenn Maxwell Anderson, dismissed the criminal case against the Plaintiff when his name was called.

144.    The dismissal occurred without providing a reason.

145.    After the case was dismissed and Judge Saragosa informed the plaintiff that he was free to go, the plaintiff asked the judge whether the restriction preventing entry to the Las Vegas Strip corridor had been lifted.

146.    The judge confirmed that the restriction had been lifted, and the plaintiff was free to go.

147.    At that moment, Glenn Maxwell Anderson, representing the DA's office, stood up and in an accusatory tone, said, "But if you go to the casinos and walk around pressing the cash-out buttons" gesturing as if pressing a button "other officers will arrest you again."

148.    The plaintiff calmly responded, "That never happened."

149.    The judge reiterated that the plaintiff was free to go, and the plaintiff exited the courtroom.

150.    Glenn Maxwell Anderson's accusatory warning shows how Detective Lea's false statements led others to believe the plaintiff was roaming casinos and pressing cash-out buttons on slot machines to claim credits.


**Detective Lea's Deliberate Fabrication of Evidence Through a Perjured Affidavit**

151.    Defendant Lea knowingly included false statements in the arrest affidavit, claiming he observed Plaintiff pressing the cash-out button on a row of slot machines without inserting cash or credit, in an attempt to claim unplayed credits. This statement is false, and here's why:

152.    As indicated in the arrest report, Plaintiff could see whether unplayed credits (also referred to as abandoned credit) were available by simply walking past the machines, without pressing the cash-out button.

153.    This shows that pressing the cash-out button was unnecessary to check for unplayed credits.

154.    Therefore, Plaintiff would only press the button when unplayed credits were present, specifically to claim them.

155.    Defendant Lea claimed to have observed Plaintiff pressing the cash-out button to claim unplayed credits, which implies that unplayed credits were available in the machines where Plaintiff pressed the button.

156.    He further stated that he has experience and training, meaning he knows that pressing the cash-out button dispenses a TITO ticket if there are available credits in the machines.

157.    Based on Defendant Lea's own logic and assertion, Plaintiff would only press the cash-out button when credits were available, since he could see available credits without pressing the button.

158.    Therefore, when Plaintiff presses the cash-out button, it indicates there are credits, and he pressed it to collect them.

159.    As a result, Plaintiff would have received a TITO ticket for every machine where he pressed the cash-out button.

160.    As Defendant Lea claimed, Plaintiff pressed the cash-out button on a row of slot machines.

161.    Therefore, Plaintiff should have collected a TITO ticket for each machine where he pressed the button.

162.    Since a row consists of at least two machines, Plaintiff should have received at least two TITO tickets printed from the Flamingo for Defendant Lea's claim to be true.

163.    However, at the time of Plaintiff's detention, he had only one TITO ticket from the Flamingo, which he obtained using his own money.

164.    Therefore, based on the discrepancy between Defendant Lea's claim and the facts, Defendant Lea knowingly made a false statement under oath.

165.    Alternatively, if there were no available credits in the machines where Plaintiff pressed the cash-out button, Defendant Lea could not justifiably accuse Plaintiff of attempting to claim unplayed credits.

166.    If no credits existed, there would be nothing to claim.

167.    Thus, Defendant Lea knowingly made a false statement under oath.

168.    Additionally, Flamingo has extensive surveillance footage that could verify the events.

169.    Defendant Lea spoke with employees and investigated the alleged crime, which should have dispelled the allegations.

170.    Instead, Defendant Lea deliberately falsified statements to fabricate the appearance of probable cause.

**Detective Lea's Deliberate Omission of Material Facts in the Arrest Affidavit**

171.     Defendant Lea intentionally omitted the fact that Plaintiff had been playing at the Flamingo, completing five sessions across three different games before his detention.

172.     This omission was critical because it misrepresented Plaintiff's actions, creating the false impression that he was solely at the Flamingo searching for unplayed credits.

173.     Defendant Lea omitted Plaintiff's statement that the eight TITO tickets in his possession were his.

174.     This omission was material because both the prosecutors and the judge assumed the tickets were stolen due to the absence of information about Plaintiff's ownership.

175.     Defendant Lea deliberately omitted the origin of four of the TITO tickets found in Plaintiff's possession.

176.     This omission misled the reader into believing the four tickets were printed at the Flamingo while he was observing.

177.     It further reinforced Defendant Lea's false claim that Plaintiff was pressing cash-out buttons without inserting cash or credit.

178.     Defendant Lea also omitted the print time and date of the tickets.

179.     This information would have shown that the tickets were unrelated to Plaintiff's gameplay at the Flamingo.

180.    By omitting this, Defendant Lea falsely suggested that the tickets were obtained there while he was observing.

181.    Defendant Lea also failed to specify the value of the TITO tickets Plaintiff was alleged to have taken.

182.    This omission fueled speculation about the severity of the alleged offense and further distorted the facts to justify a bad-faith arrest.

183.    Defendant Lea deliberately omitted witness statements from Flamingo employees and the results of his investigation, all of which would have contradicted his false allegation.

**Defendant Detectives' Reckless Disregard for the Truth and False Statements to Flamingo Employees**

184.    Defendant Lea knowingly made false statements to Flamingo employees.

185.    He stated that Plaintiff had no money other than small-value stolen TITO vouchers.

186.    Despite knowing that three valid debit cards were in Plaintiff's possession, Lea falsely claimed that Plaintiff had no money.

187.    These deceptive statements were intended to mislead Flamingo employees and alter their perception of Plaintiff.

188.    The defendant detectives knew that Plaintiff had no criminal record.

189.    The defendant detectives knew Plaintiff was a tourist staying at Harrah's.

190.     The defendant detectives knew Plaintiff was a high-level player with Diamond status and a Seven Stars companion card.

191.     The defendant detectives and Flamingo employees knew, or should have known, that Plaintiff was up $3,174 at Harrah's at the time of his detention.

192.     Given these facts, any claim that Plaintiff was searching for unplayed credits was unreasonable.

193.     Had the detectives not intentionally disregarded these facts, they would have reached a reasonable conclusion about the circumstances of Plaintiff's arrest.

194.     Plaintiff believes that if he were not Black, the arrest would not have occurred.

**Plaintiff's Play History at Caesars Entertainment Inc. Casinos.**

195.     Plaintiff frequently visits Caesars casinos in Atlantic City.

196.     He primarily plays electronic craps, a game that doesn't offer rewards or tier credits, though player activity is still tracked.

197.     Plaintiff regularly receives complimentary accommodations from the Flamingo and Harrah's, especially during the World Series of Poker.

198.     His 2023 visit was no exception, with Plaintiff continuing to receive promotional offers.

199.     This directly contradicted John Doe's malicious statement: "I don't know why Harrah's would want someone like you."

200.     Caesars' systems integrate data across Atlantic City and Las Vegas locations.

201.     This allows quick access to a player's activity, including wagers, wins, losses, and frequently played games.

202.     Flamingo employees intentionally or recklessly disregarded this data.

203.     The Flamingo has over 700 slot machines, yet on June 17, 2023, Plaintiff interacted with or looked at only 10 specific machines, which he identified by name.

204.     The claim that he was searching for unplanned credits was baseless.

**Checking Slot Machines for Progressive Bonuses and Jackpots**

205.     Slot machines in casinos offer distinct bonuses and progressive jackpots to entice play, with the winning conditions and payouts clearly displayed on the screen.

206.     Depending on the slot machine, bonus status information is displayed in various locations—some on the bottom touch panel, requiring players to look down, while others place it at the top.

207.     As Plaintiff walked through the casino, he glanced down at the touch panels of certain machines to check their bonus status and progressive wild features.

208.     Defendant Lea deliberately misrepresented Plaintiff's actions, falsely portraying him as attempting to search for abandoned credits.

209.     Plaintiff was switching the betting denomination and viewing different bonus statuses on the slot machine, as each denomination had a unique bonus status, requiring physical interaction with the machine.

210.     At the Flamingo, players routinely check machines before playing without being stopped, questioned, or arrested.

211.     This further demonstrates that Plaintiff's actions aligned with standard casino practices.

212.    Yet, Plaintiff was arrested for engaging in the same lawful activity that other

players regularly perform without interference.

213.    This selective enforcement, where Plaintiff was targeted while others in

similar circumstances were not treated the same, constitutes a violation of the Equal

Protection Clause.

**Norms, Practices, and the Reality of Playing Slot Machines in Casinos, Including**

**at the Flamingo**

214.    The Flamingo provides no guidance to slot machine players regarding

gameplay, machine selection, or restrictions.

215.    There are no written notices explaining whether a machine with small credits

left by a previous player is unavailable for the next player or whether it is permissible

to play on such machines.

216.    No warning signs are posted on the slot machines to prompt players to double-

check for abandoned credits before depositing cash or tickets.

217.    Flamingo deliberately omits warnings about remaining credits to maintain a

seamless atmosphere that encourages players to insert money without hesitation.

218.    Signage alerting players to check for credits or warning of legal consequences

would disrupt the ease and relaxing environment of the casino, as it would make

players more cautious.

219.    . Without such guidance, the Flamingo ensures uninterrupted play, even at the

risk of players facing arbitrary prosecution.

220.    The absence of guidance from Flamingo leaves players to navigate these circumstances on their own, leading them to follow common casino norms by default.

221.    The casino norm dictates that players assume machines are available unless an obvious indicator, such as an occupied chair, a player card in the machine, or personal items left behind, suggests otherwise.

222.    Players frequently encounter machines with small, abandoned credits and, following common casino norms, they routinely insert cash or tickets to continue playing.

223.    These actions have never been considered criminal and do not violate NRS 465.070(3).

**The Flamingo: Profiting from Abandoned Slot Machine Tickets at the Expense of Casino Players' Rights**

224.    In the last three fiscal years, gamblers abandoned over $72 million in slot machine credits in Nevada, the vast majority of which were TITO tickets.

225.    Nevada casinos, including the Flamingo, keep 25%, while the state collects the rest.

226.    At the Flamingo, ticket redemption machines do not dispense coins for amounts under a dollar.

227.    This intentionally inconveniences players by requiring them to visit the cashier for small change.

228.    It discourages redemptions and forces players to abandon their credits.

229.     Ultimately, this increases the volume of unclaimed vouchers, which

financially benefits the Flamingo.

230.     The Flamingo's financial interest in abandoned vouchers conflicts with

players' ability to redeem small-value credits or TITO tickets.

231.     To preserve this revenue, the Flamingo denies players a convenient way to

cash out small credits.

232.     As a result, the frequency of abandoned credits increases, making it inevitable

for other players to use these unclaimed credits, either knowingly or unintentionally.

233.     While the Flamingo profits from abandoned credits, it has failed to implement

safeguards to prevent the use of leftover credits.

234.     A simple notice or warning to check machines for abandoned credits before

inserting cash or credit could prevent unwarranted arrests and prosecutions.

**The Challenged Revised Statute of Nevada: Unconstitutionality of NRS
465.070(3) as Applied to TITO (Ticket In, Ticket Out) Slot Machine Technology
Due to Vagueness and Arbitrary Enforcement**

235.     When NRS 465.070(3) was enacted on June 6, 1981, Nevada casinos primarily

used physical coins for slot play.

236.     These tangible coins functioned as wagers.

237.     The law was intended to address clear cases of theft or fraud involving

physical coins or gaming chips.

238.     Since the introduction of TITO in Nevada casinos in the early 2000s—nearly 20 years after NRS 465.070(3) was enacted—the Nevada Legislature has amended NRS 465.070 five times.

239.     However, the language and intent of Section 3 remain unchanged, leaving the statute ill-equipped to address the challenges posed by TITO technology in modern slot machines.

240.     NRS 465.070(3) makes it unlawful for any person:

"To claim, collect, or take, or attempt to claim, collect, or take, money or anything of value in or from a gambling game, with intent to defraud, without having made a wager contingent thereon, or to claim, collect, or take an amount greater than the amount won."

241.     The intended purpose of this provision cannot be effectively achieved given the additional complexities introduced by the adaptation of TITO technology.

242.     The statute fails to account for fundamental aspects of slot machine play associated with TITO-based gaming, including:

(1) The frequent intentional abandonment of credits by players in slot machines, which can cause other players to unintentionally use them due to the way credits are displayed on modern slot machines.

(2) The fact that, when players encounter abandoned credits in a slot machine they choose to play, they must press the cash-out button to remove the credits if they do not want to insert their own money while the previous credits remain; and

(3) As a result, this routine action — pressing the cash-out button to clear

abandoned credits — could be misinterpreted as a violation of the statute,

specifically as an attempt to take the credits.

243.    The mere act of pressing a cash-out button and removing the ticket—without

first inserting cash or credit—can be misconstrued as an offense, even if the ticket is

never used.

244.    This stems from the statute's failure to clearly define "intent to defraud" or

"attempt to claim, collect, or take" in the context of TITO-based slot machine play.

245.    A bystander with an evil eye might assume a player deliberately left a TITO

ticket behind after noticing they were being observed, regardless of the player's actual

intent.

246.    To avoid accusations of "attempt to claim, collect, or take," players are

effectively forced to insert cash or a ticket into machines with abandoned credits and

play, even if they do not wish to use them.

247.    However, this action is also treated as a violation of NRS 465.070(3) under

"intent to defraud" because the statute fails to clarify what constitutes "intent to

defraud" in the context of TITO-based gameplay.

248.    Casinos including Flamingo, intentionally failed to provide guidance on how

players should handle abandoned credits.

249.    As a result, players are left without clear instructions, and no matter what

action they take—whether inserting money into a machine with abandoned credits or

cashing out the abandoned credits before playing—they risk being accused of

violating NRS 465.070(3).

250.    The statute fails to provide fair notice of the conduct that constitutes a

violation, thereby encouraging inconsistent enforcement.

251.    In 1981, legislators could not have anticipated situations where players would

insert a TITO ticket into a machine containing abandoned credits left by a previous

player.

252.    Players may inadvertently insert cash or TITO ticket into a machine with

abandoned credits due to several factors:

- Modern slot machines are visually overwhelming, with flashing lights, animations,

  and numerous on-screen numbers, making available credits easy to overlook.

- Casinos, including the Flamingo, intentionally provide unlimited complimentary

  alcoholic beverages, which impair players' attention and focus during gameplay,

  making it harder for them to notice details such as their wins, losses, or abandoned

  credits on a slot machine.

- Casinos, including the Flamingo, deliberately leave slot machines open for play while

  retaining abandoned credits from previous players, shifting the burden onto the next

  player to notice and decide how to proceed.

- Among other factors, players — whether absent-minded or experiencing vision

  problems — may easily overlook the existence of unplayed credits in slot machines.

253.    The Plaintiff was never informed of the basis for his detention.

254.    During the course of play, Plaintiff may have inadvertently inserted TITO

tickets into a slot machine that retained a small amount of abandoned credits left by a

previous player, resulting in the unintentional use of such credits.

255.    Although Plaintiff's conduct did not constitute a violation of NRS
465.070(3), Defendants deliberately fabricated facts to falsely suggest a
violation, exploiting the statute's susceptibility to arbitrary and discriminatory
enforcement.

256.    Under any reasonable interpretation of NRS 465.070(3), Plaintiff's actions did
not constitute a violation.

257.    Given the numerous scenarios in which innocent player conduct may be
criminalized—scenarios the statute fails to address—the enforcement of NRS
465.070(3) in the context of modern TITO-based slot machine gaming is impractical.

258.    Its application leads to arbitrary and discriminatory enforcement, rendering the
statute unconstitutionally vague as applied.

**259.**    Plaintiff does not assert that Defendants Lea and West were obligated to
recognize the potential unconstitutionality of the statute.

260.    Rather, Plaintiff brings this action based on Defendants' deliberate fabrication
of evidence to falsely accuse him of a crime he did not commit.


**Clark County "Order-Out Corridor" Ordinance (Chapter 12.02.020)**

261.    In August 2022, Clark County enacted an ordinance (Chapter 12.02.020)
establishing an "order-out corridor" encompassing most of the Las Vegas Strip.

262.    The ordinance grants judges the authority to ban individuals with suspended
sentences or deferred adjudication from this area.

263.    Additionally, the court maintains a database of those banned, most of whom have histories of drug or prostitution-related offenses.

264.    These individuals are designated as "chronic and repeat offenders."

265.    Plaintiff has never been convicted of any crime, entered a guilty or no-contest plea, or been subject to any sentence or deferred adjudication.

266.    Despite this, the court unlawfully designated Plaintiff as a chronic offender and barred him from the Las Vegas Strip corridor for nearly eight months without due process. This restriction was imposed without a plea, or probation condition, as no such basis existed.

267.    Jason Potts, Chief of the Department of Public Safety, emphasized the significance of these classifications, stating that 10% of chronic offenders are responsible for 60% of all crimes.

268.    This statistic underscores the perceived threat posed by individuals listed in the "order-out corridor" database, which is monitored by Metro and Public Safety Departments.

**FIRST COUNT**

**Deliberate Fabrication of Evidence**

42 U.S.C. § 1983—Fourteenth Amendment—Due Process

*(Against Metro, Detective Gabriel Lea and Detective Brooks West (hereafter*

*collectively "Metro Defendants")*

269.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

270.    At all relevant times, Defendants Lea and West, acting under color of state law and purporting to perform official duties under Metro, engaged in actions and omissions during the course of their official duties as peace officers that deprived Plaintiff of his constitutional rights.

271.    Defendants Lea and West, acting individually and in concert as peace officers, deprived Plaintiff of his Fourteenth Amendment due process rights by deliberately fabricating evidence.

272.    Specifically, Defendant Lea submitted a perjured arrest affidavit containing deliberately falsified statements and intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading, including:

- He claimed he observed Plaintiff walking up and down rows of slot machines, pressing the cash-out button without inserting any credit or cash in them, in an attempt to claim money or unplayed credits. This statement was false.

- He alleged he observed Plaintiff "sit at a machine he had not been playing at and press the cash-out button to retrieve unplayed credits." This statement was false or intentionally or recklessly omitted facts necessary to prevent a technically true statement from being misleading.

- He deliberately omitted the fact that Plaintiff had been playing slot machines before his detention, which would have substantiated Plaintiff's possession of the TITO ticket from the Flamingo.

- He deliberately misrepresented Plaintiff's act of walking through the casino as if he were searching for abandoned credits, falsely implying that Plaintiff was seeking abandoned credits and thereby creating a false narrative of criminal activity.

- Defendant Lea deliberately omitted the origins of four TITO tickets found in Plaintiff's possession while specifying the origins of the remaining four.

- This selective omission misrepresented the facts, creating the false impression that the unspecified TITO tickets were printed from the Flamingo while Defendant Lea was observing.

- Defendant Lea deliberately omitted Plaintiff's statement that he informed both Defendants Lea and West of his rightful ownership of the TITO tickets and requested that they verify it.

- Defendant Lea intentionally omitted the amounts of the TITO tickets he alleged Plaintiff took, despite no such incident ever occurring.

- The arrest affidavit, which resulted in Plaintiff's detention, arrest, and criminal charge, relied solely on Defendant Lea's fabricated observations.

- Defendant Lea deliberately omitted Plaintiff's statements, statements from Flamingo employees, and findings from his own investigation.

- Defendant Lea's sworn statements, were demonstrably false and intended to deceive the judiciary, manufacturing probable cause rather than accurately reflecting the totality of the circumstances.

273.    Defendant Lea engaged in arbitrary governmental action by deliberately falsifying statements, fully aware that they would likely result in the loss of Plaintiff's liberty and cause other harm.

274.    Defendant Lea's deliberate fabrication of evidence was accepted as true by both prosecutors and the judge.

275.    Defendant Lea's deliberate fabrication of evidence directly caused the wrongful criminal charges against Plaintiff, as this evidence was essential to initiating and sustaining the prosecution.

276.    Without the deliberate fabrication of evidence, the charges would not have been filed or pursued, and Plaintiff would not have suffered the resulting harm.

277.    The Fourteenth Amendment protects individuals from being subjected to criminal charges based on false evidence deliberately fabricated by the government.

278.    Defendant Lea engaged in egregious misconduct that shocks the conscience and offends the community's sense of fair play and decency by deliberately fabricating evidence to frame Plaintiff for a crime he did not commit—an act so egregious that it goes beyond the bounds of decency, utterly intolerable in a civilized society, thereby violating Plaintiff's Fourteenth Amendment rights.

279.    Defendant Lea continued to advance the prosecution of Plaintiff by perpetuating falsehoods to the prosecutor and judge, despite knowing the evidence was fabricated, as evidenced by the prosecutor repeating Lea's claim in open court.

280.    The fabricated evidence was instrumental in prolonging Plaintiff's prosecution for nearly eight months, causing loss of liberty and emotional distress.

281.     Without the materiality of the fabricated evidence, Plaintiff would not have been charged, or the charges would have been dismissed early in the proceedings, preventing the severe harm caused.

282.     There is a reasonable likelihood that if the deliberate fabrication of evidence had been presented to the jury, it would have influenced their judgment.

283.     The deliberate fabrication of evidence was a material cause of the harm Plaintiff has suffered, is suffering, and will continue to suffer.

284.     Defendant Lea is liable for deliberately fabricating evidence in bad faith with the intent to harm Plaintiff and deceive the court into wrongfully charging him with a crime he did not commit.

285.     Acting with malice and a reckless disregard for the truth, Defendant Lea knowingly caused severe personal, emotional, and reputational harm to plaintiff.

286.     Defendant West is liable for his involvement in the unlawful seizure and the use of excessive force through unreasonable handcuffing.

287.     As an active participant in the chain of events that culminated in Plaintiff's wrongful arrest, and for his failure to intervene in the egregious misconduct by Defendant Lea when he had the opportunity, Defendant West is equally liable for the violation of Plaintiff's constitutional rights.

288.     Upon information and belief, Defendants Lea and West's misconduct was directly caused by the policies, practices, and customs of Defendant Metro, including its sufficiently inadequate supervision, which amounts to deliberate indifference to plaintiff's injuries.

289.     Officers in the Convention Center Area Command (CCAC) have a longstanding practice of perjury and wrongful arrests, particularly targeting black individual in Las Vegas Strip casinos.

290.     Metro's failure to prevent this foreseeable misconduct constitutes deliberate indifference to Plaintiff's rights.

291.     Metro's failure to address this longstanding practice was the moving force behind the misconduct and directly contributed to the violation of Plaintiff's constitutional rights.

292.      Metro is liable for failing to take corrective action or reprimand officers, despite the longstanding practice within the CCAC of submitting false affidavits to justify wrongful arrests.

293.     The egregious misconduct described in this Count was objectively unreasonable, intentional, and undertaken with reckless and deliberate indifference to the rights of others.

294.     The deliberate fabrication of evidence is a material cause of the harm Plaintiff suffered and will continue to suffer.

295.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered a loss of liberty, public stigma, emotional distress, mental anguish, among other severe and ongoing injuries.

296.     As a direct and proximate result of the deliberate fabrication of evidence, Plaintiff has suffered, continues to suffer, and will suffer damages in an amount to be proven.

297.    Plaintiff seeks compensatory damages against all Defendants for this count, punitive damages against the individual Defendants, and any other relief the Court deems just and proper.

**SECOND COUNT**

**Deprivation of a Protected Liberty Interest (Stigma Plus)**

42 U.S.C. § 1983—Fourteenth Amendment—Due Process

*(Against Metro, Detective Gabriel Lea and Detective Brooks West)*

298.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

299.    At all relevant times, Defendants Lea and West, acting under color of state law and in their official capacity as peace officers for Metro, engaged in actions and omissions that deprived Plaintiff of liberty.

300.    Defendant Lea deliberately fabricated evidence and presented it to prosecutors and a judge to support a baseless criminal charge, violating Plaintiff's right to due process under the Fourteenth Amendment.

301.    Solely based on Defendant Lea's falsified statements, a Clark County Justice Court judge wrongfully issued an "Order Out Corridor" at Plaintiff's initial court appearance on June 19, 2023, barring Plaintiff from accessing the Las Vegas Strip corridor.

302.    As a result, Plaintiff was unjustly added to the court's database of chronic and repeat offenders, restricting his access to the Las Vegas Strip for nearly eight months.

303.    The "order out corridor" was issued without due process, as Plaintiff was never given an opportunity to be heard before its imposition.

304.    Although the judge independently issued the order, the decision was influenced by Metro's official policies and practices, which encourage broad judicial discretion and the presumption that Metro officers are familiar with repeat and chronic offenders in the Las Vegas tourist area, ultimately resulting in the issuance of the order.

305.    This presumption was further reinforced by media reports citing a recorded Las Vegas police interview, which stated that Metro officers are familiar with chronic and repeat offenders in the city's tourist areas.

306.    Additionally, City Attorney Jeff Dorocak stated that the "order out corridor" is designed to target chronic offenders, allowing Metro Police to ban individuals from specified tourist corridors for repeated misdemeanors rather than incarcerate them.

307.    Metro lacked any independent procedural mechanism by which Plaintiff could challenge the restriction or the inclusion in the criminal database, making it impossible to contest its issuance.

308.    As a result, Plaintiff remained subject to it for eight months until the case was dismissed in his favor.

309.    The judge wrongfully issued the "Order Out Corridor," assuming Plaintiff's TITO tickets were stolen.

310.    Defendant Lea intentionally omitted the fact that Plaintiff owned the tickets, thereby preventing the judge from drawing any other inference.

311.    The court's order, tainted by Defendants' actions, demonstrate that the procedural safeguards afforded to Plaintiff were constitutionally inadequate.

312.     The process failed to protect Plaintiff's liberty interest and Plaintiff's access to gaming establishments on the Las Vegas Strip.

313.     Despite the high risk of individuals being wrongly profiled and criminally charged by Metro officers, Defendant Metro, operating under color of state law and as a primary proponent of the ordinance, adopted a policy granting judges the discretion to issue the "Order Out Corridor."

314.     This decision was made with deliberate indifference to the foreseeable risk of depriving individuals of their liberty and access to the Las Vegas Strip, despite clear warnings from the ACLU of Nevada concerning the dangers inherent in the case-by-case nature of the "Order Out Corridor."

315.     Metro's failure to provide adequate supervision of its officers, allowing egregious misconduct—including perjury—that led to the intentional framing of individuals, constitutes deliberate indifference to Plaintiff's injuries.

316.     The wrongful inclusion of Plaintiff in the court's database as a repeat offender, accessed by Metro and the Department of Public Safety, falsely associated Plaintiff with convicted criminals and labeled Plaintiff as a chronic offender.

317.     The inclusion of Plaintiff in the criminal database, along with its public dissemination, implicates Plaintiff's good name, reputation, honor, and integrity, causing significant harm that is protected under the Due Process Clause.

318.     Even after Plaintiff's criminal case was dismissed in his favor, his name remains listed in various government databases, as well as in the records of casinos and research organizations involved with the "Order Out Corridor," marking him as a chronic offender.

319.    The "order out corridor," denied plaintiff access to the Las Vegas strip, an area encompassing roads, highways, and gaming establishments hosting the World Series of Poker (WSOP).

320.    This violation of his liberty interest is protected under the Fourteenth Amendment's guarantees of due process, Article 1, Section 8 of the Nevada Constitution, and Nevada state law, including NRS 463.0129(1)(e).

321.    The Fourteenth Amendment prohibits any state from depriving a person of life, liberty, or property without due process of law, and ensures equal protection under the law.

322.    Similarly, Article 1, Section 8 of the Nevada Constitution provides that no person shall be deprived of life, liberty, or property without due process of law, which the court's order violated.

323.    NRS 463.0129(1)(e) mandates that all gaming establishments remain open to the general public, with no restrictions on access to gaming activities unless specifically authorized by the Legislature.

324.    The court's order completely extinguished Plaintiff's right, as previously recognized under Nevada law NRS 463.0129(1)(e), which guarantees Plaintiff's access to gaming establishments in Nevada as a member of the general public.

325.    Under the Fourteenth Amendment, States may, under certain circumstances, create liberty interests protected by the Due Process Clause, and once a state creates a liberty interest, it cannot take it away without due process.

326.    When a state statue imposes both a stigma and a tangle burden on an individual's ability to obtain a right or status recognized by state law, an individual's liberty interest has been violated.

327.    If not for the unjust "order out corridor,"

- Plaintiff's liberty interest would not have been extinguished, and he would have been able to participate in the WSOP tournaments.

- His name would not have been stigmatized as a chronic offender, nor disseminated to agencies nationwide.

328.    The defendant's misconduct was egregious, objectively unreasonable, intentional, and carried out with reckless disregard for the plaintiff's protected liberty interest.

329.    Defendant Lea is liable for deliberately fabricating evidence in bad faith to harm Plaintiff and deceive the court.

330.    Upon information and belief, Defendant Metro knew that the enforcement of the "Order Out Corridor" posed a significant risk of wrongful accusations due to police misconduct, profiling, or errors leading to wrongful inclusion.

331.    Defendant Metro knew or should have known that judges rely on affidavits from its officers, who claim familiarity with repeat offenders, increasing the risk of wrongful inclusion in the "Order Out Corridor."

332.    This risk was foreseeable, especially given the warnings from groups like the ACLU, which Metro ignored.

333.    By disregarding these warnings, Metro showed deliberate indifference to Plaintiff's injuries.

334.    Nothing in the ordinance prevented Metro from creating an independent procedure for individuals to challenge their erroneous inclusion in the "Order Out Corridor," given the high risk of wrongful accusations.

335.    By failing to implement such a procedure, Metro adopted a policy or custom that deprived Plaintiff of a protected liberty interest without due process, in violation of the Fourteenth Amendment.

336.    Metro's inaction was the Moving force behind the violation of Plaintiff's liberty interest, further demonstrating its disregard for constitutional protections.

337.    As a direct and proximate result of the violation of plaintiff's protected liberty interest, plaintiff has suffered, is suffering, and will continue to suffer damages in an amount to be proven.


**THIRD COUNT**

**Malicious Prosecution**

**42 U.S.C. § 1983—Fourth and Fourteenth Amendments**

*(Against Metro, Detective Gabriel Lea and Detective Brooks West)*

338.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

339.    At all relevant times, defendants Lea and West, acting under color of state law and within their duties as Metro officers, violated Plaintiff's Fourth and Fourteenth Amendment rights by deliberately fabricating evidence to manufacture probable cause, causing a malicious prosecution.

340.     Defendants Lea and West, acting with malice and intent to harm, unlawfully

seized Plaintiff and initiated criminal charge against him without probable cause,

subjecting him to unjust legal proceedings.

341.     Defendant Lea caused criminal charge to be filed on July 14, 2023, stemming

from the wrongful arrest on June 17, 2023.

342.     Defendants Lea and West violated Plaintiff's Fourth and Fourteenth

Amendment rights by initiating and prolonging a malicious prosecution.

343.     Their actions caused an unreasonable seizure when Plaintiff was detained in

jail for 30 hours and led to a prolonged deprivation of liberty during the eight-month

baseless criminal proceeding.

344.     Defendant Lea deliberately falsified statements to misrepresent Plaintiff's

lawful actions as a violation of NRS 465.070(3).

345.     Without these false statements and omissions, Plaintiff's actions could not

reasonably be seen as a violation of the statute.

346.     Defendant Lea initiated a malicious prosecution in bad faith, wrongfully

charging Plaintiff with a crime he did not commit.

347.     All actions related to Plaintiff's arrest and the resulting criminal charge were

dismissed in Plaintiff's favor at the preliminary hearing on February 13, 2024.

348.     Upon information and belief, Metro's policies, customs, and practices,

including the failure to adequately supervise and discipline officers, were the moving

force behind and the proximate cause of the misconduct committed by Defendants

Lea and West.

349.    Officers in the Convention Center Area Command have a longstanding custom of perjury and wrongful arrests, particularly targeting black individuals.

350.    Metro's failure to address this practice directly contributed to Plaintiff's harm and constitute as deliberate indifference to constitutional violations of the plaintiff.

351.    The misconduct described in this Count was objectively unreasonable, intentional, and undertaken with reckless disregard and deliberate indifference to the constitutional rights of others.

352.    As a direct and proximate result of this malicious prosecution, Plaintiff has suffered, is suffering, and will continue to suffer damages, including emotional distress, loss of liberty, public stigma, anxiety, humiliation, and financial loss, in an amount to be proven at trial.

**FOURTH COUNT**

**Unreasonable Search and Seizure**

**42 U.S.C. § 1983—Fourth and Fourteenth Amendments; Article 1, Section 18 of the Nevada Constitution**

*(Against Metro, Detective Gabriel Lea, and Detective Brooks West)*

353.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

354.    **Defendants Lea and West, acting under color of state law, violated Plaintiff's Fourth Amendment rights and Article 1, Section 18 of the Nevada Constitution by fabricating evidence, resulting in an unreasonable search and seizure.**

355.    **The Fourth Amendment and Article 1, Section 18 of the Nevada Constitution prohibit unreasonable searches and seizures.**

356.    Plaintiff has never engaged in criminal activity.

357.    Plaintiff has never violated NRS 465.070(3).

358.    Defendant Lea fabricated the facts to justify the stop and detention.

359.    Defendants Lea and West approached Plaintiff at the slot machine, displaying official authority in full Metro police uniforms, badges, and service firearms, before handcuffing and restraining him within seconds.

360.    Plaintiff did not resist arrest, attempt to flee the scene, or pose any threat to the Defendant detectives or those around him.

361.    As a result of their actions, plaintiff reasonably believed that he was not free to leave and, in fact, submitted to their assertion of authority.

362.    The defendant detectives intentionally exercised their governmental power to unlawfully handcuffed and restrict plaintiff's freedom of movement.

363.    From the outset, Defendants Lea and West focused solely on arresting Plaintiff, not investigating his actions or verifying any criminal conduct.

364.    Defendants Lea and West abused their police authority to coerce Plaintiff's consent while he was handcuffed and under duress, making the search unlawful due to the lack of valid consent.

365.    Defendant detectives seized Plaintiff's property despite no connection to any crime.

366.    This government interference with Plaintiff's possessory interest in his TITO tickets violated his rights to possess and control his property.

367.    This conduct was carried out with malice as the defendants Lea and West had
no probable cause to detain plaintiff and unlawfully placed him in custody against
plaintiff's will for 30 hours.

368.    Plaintiff did not consent to the violation of his rights.

369.    Defendants Lea and West fabricated evidence and concealed key facts to
falsely create probable cause and justify the bad faith arrest.

370.    Defendant Lea initiated the stop and detention solely based on his fabricated
observation.

371.    Plaintiff was subjected to an unjustified Terry stop and detention without
reasonable suspicion, violating the Fourth Amendment.

372.    The search and seizure were objectively unreasonable, violating Plaintiff's
Fourth Amendment rights.

373.    Defendants Lea and West intentionally seized Plaintiff's person without
probable cause.

374.    Absent the defendant Lea's demonstrably false assertions and the omission of
critical material facts, plaintiff's actions cannot objectively and reasonably be
construed criminal act.

375.    Upon information and belief, Metro's policies, customs, and practices,
including the failure to adequately supervise and discipline officers, were the moving
force behind and the proximate cause of the misconduct committed by Defendants
Lea and West.

376.    Officers in the Convention Center Area Command have a history of perjury
and wrongful arrests, particularly targeting black individuals.

377.    Metro's failure to address this practice directly contributed to Plaintiff's harm and shows deliberate indifference to constitutional violations of others.

378.    Due to Metro defendants' Fourth Amendment violations, Plaintiff has suffered—and will continue to suffer—damages including emotional distress, humiliation, loss of liberty, and harm to reputation, in an amount to be proven.

**FIFTH COUNT**

**42 U.S.C. § 1983 – Monell Claim**

Municipal Liability for Policies, Customs, and Practices

*(Against Las Vegas Metropolitan Police Department ("Metro"))*

379.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

380.    At all relevant times, Defendants Lea and West, acting under color of state law and in their official duties as Metro officers, engaged in actions and omissions that violated Plaintiff's Fourth and Fourteenth Amendment rights.

381.    Defendants Lea and West, stationed in the Convention Center Area Command (CCAC), committed misconduct in accordance with defendant Metro's longstanding practices, which mirror the pattern of made-up arrests and submitting perjured affidavits by other officers in the CCAC.

382.    Their actions are like those of Sgt. Kevin Menon, who faced indictment for similar, multiple documented offenses within the CCAC.

383.    Defendant Metro's failure to adopt an adequately sufficient supervision of its employees and to intervene in the longstanding pattern of such misconducts, despite

the foreseeability of Plaintiff's injuries, amounts to a policy of inaction and official nonfeasance, constituting a Monell violation.

384.    This failure allowed the wrongdoing to continue unchecked, directly enabling the misconduct that caused Plaintiff's constitutional injury and demonstrating deliberate indifference to others.

385.    Had defendant Metro intervened and held officers accountable, the violation of Plaintiff's rights could have been prevented.

386.    The longstanding pattern of misconduct by Metro officers in the CCAC, including the repeated targeting of Black individuals in Las Vegas Strip casinos through the deliberate fabrication of evidence, was the moving force behind the violation of Plaintiff's constitutional rights.

387.    Defendant Metro, operating under color of state law and as a primary proponent of the "order out corridor" ordinance, implemented a policy granting judges the discretion to issue the "Order Out Corridor," despite the high risk of individuals being wrongly profiled and criminally charged by Metro officers.

388.    Defendant Metro also knew that judges relied on affidavits and testimony from Metro officers, who were presumed to be familiar with chronic and repeat offenders.

389.    This decision was made in disregard of warnings from the ACLU of Nevada about the risk of erroneously labeling individuals as chronic offenders in the court's database, resulting in unjustified deprivations of liberty, particularly given the case-by-case nature of the "Order Out Corridor."

390.    The risk was foreseeable, and defendant Metro ignored these concerns, demonstrating deliberate indifference to Plaintiff's injuries.

391.    Defendant Metro was aware that the enforcement mechanism carried a significant risk of wrongful accusations due to police misconduct, intentional profiling, baseless claims, or errors that could lead to individuals' wrongful inclusion in the "Order Out Corridor."

392.    Defendant Metro has actual or constructive knowledge that judges relied on affidavits from officers who claimed familiarity with repeat offenders, increasing the risk of mistaken inclusion.

393.    Additionally, defendant Metro failed to establish an independent procedure for individuals to challenge their erroneous inclusion in the "Order Out Corridor," despite the high risk of wrongful accusations.

394.    By failing to implement such a procedure, defendant Metro adopted a policy or custom that deprived Plaintiff of a protected liberty interest without due process, violating the Fourteenth Amendment.

395.    Metro's inaction was the moving force behind the violation of Plaintiff's liberty interest, further demonstrating its disregard for constitutional protections.

396.    Defendant Metro's actions and inactions, as stated in this count, were objectively unreasonable.

397.    The violation of Plaintiff's liberty interests and resulting injuries were caused by Defendant Metro's longstanding unconstitutional practice — carried out by its officers — of fabricating evidence, and by its policy of inaction to prevent such misconduct.

398.    As a direct and proximate result of defendant Metro's unconstitutional longstanding practice of fabricating evidence and its policy of inaction, Plaintiff has

1    suffered, is suffering, and will continue to suffer damages, including but not limited to

2    loss of liberty, severe public stigma, emotional distress, and reputational harm, in an

3    amount to be proven.

4

5    **SIXTH COUNT**

6    **42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

7    *(Against Metro, Detective Gabriel Lea. Detective Brooks West, Caesars*

8    *Entertainment, Inc., and Flamingo Las Vegas Operating Company, LLC)*

9    399.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

10   400.    At all relevant times, defendants Lea and West, acting under color of state law

11       and purporting to perform official duties under Metro, engaged in conspiracy in the

12       course of their duties as peace officers that violated Plaintiff's constitutional rights.

13   401.    Defendants Lea and West, acting in concert with Flamingo employees—both

14       known and unknown—conspired to frame Plaintiff for a crime he did not commit,

15       thereby depriving him of his constitutional rights, as detailed in this Complaint.

16   402.    Defendant detectives and Flamingo employees agreed to deliberately fabricate

17       evidence and exert influence to secure Plaintiff's arrest and criminal charge for a

18       crime he did not commit, took overt actions in furtherance of that agreement.

19   403.    There was an express or implied agreement among the defendant detectives

20       and Flamingo employees to deprive the Plaintiff of his constitutional rights, and as a

21       result of that agreement, the Plaintiff was deprived of those rights.

22   404.    John Doe, knowingly set in motion a chain of events, aware that Metro

23       officers routinely arrested individuals suspected of credit theft at the Flamingo.

405.    John Doe told Plaintiff he was not welcome at the Flamingo and made derogatory remarks, such as, "I don't know why Harrah's would want someone like you."

406.    He then issued an unwarranted trespass notice in the presence of Defendant detectives while stating, "It's up to you guys," explicitly inviting their wrongful arrest of Plaintiff.

407.    This coordinated conduct demonstrates a meeting of the minds between John Doe and the Defendant detectives.

408.    As a result, Defendant Lea, in furtherance of the conspiracy, submitted deliberately fabricated evidence in the form of an arrest affidavit to the court and prosecutors.

409.    By doing so, Defendants Lea and West, along with flamingo employees, conspired to achieve an unlawful purpose through unlawful means.

410.    Furthermore, these co-conspirators agreed among themselves to shield one another from liability by depriving Plaintiff of his rights.

411.    Flamingo employees were willful participants in the deprivation of Plaintiff's constitutional rights, actively collaborating with the defendant detectives.

412.    Flamingo employees' willful participation in Defendant Lea's investigation were inextricably intertwined.

413.    While Flamingo employees willfully participated in the scheme, Defendant Detectives Lea and West insinuated themselves into a position of interdependence with those employees by acting jointly to violate Plaintiff's constitutional rights.

414.    Together, Defendants Lea, West, and Flamingo employees conspired to deliberately disregard surveillance video disproving the alleged crime and fabricated false evidence to support Plaintiff's unlawful arrest and prosecution.

415.    Flamingo employees acted under color of law by willfully participating in the violation of Plaintiff's constitutional rights.

416.    By coordinating with Defendant detectives to fabricate evidence, they functioned as state agents and directly contributed to the constitutional violations committed by the detectives.

417.    Defendant detectives and Flamingo employees, motivated by shared financial interests in abandoned slot machine credits, willfully conspired to frame Plaintiff for a crime.

418.    Their coordination reflects a symbiotic relationship driven by these shared financial interests.

419.    Defendants Caesars and FLVOC failed to implement policies requiring safeguards, such as warning signs advising players to check for unplayed credits before depositing money or providing guidance on handling slot machines with unplayed credits.

420.    This failure was particularly significant, as Defendants foresaw the inevitability of unintentional credit use due to the numerous small credits left abandoned in machines, which they deliberately allowed to persist to maintain continuous play.

421.    Their policy of providing unlimited complimentary alcohol to impair guests' attentiveness, combined with the high-stress gambling environment and other

1    distractions, further increased the likelihood that players would overlook remaining

2    credits and unintentionally use them.

3    422.    Because abandoned credits and their unintentional use were foreseeable

4    consequences of Defendants' policies, they knowingly created conditions that set

5    players up for failure while deliberately disregarding their rights to avoid disrupting

6    business operations.

7    423.    At a minimum, Defendants Caesars and FLVOC should have implemented

8    procedures to resolve unintentional credit use without resorting to arrest or criminal

9    prosecution.

10    424.    This failure to implement safeguards against foreseeable risks and

11    constitutional violations demonstrates deliberate indifference to the harm suffered by

12    Plaintiff.

13    425.    Additionally, Defendants Caesars and FLVOC failed to coordinate security

14    and marketing to verify players' history and loyalty, which would have established

15    players' status and prevented wrongful arrest.

16    426.    Their failure to implement proper verification procedures resulted in a policy

17    failure that directly led to Plaintiff's wrongful arrest.

18    427.    By neglecting to establish essential safeguards, Defendants Caesars and

19    FLVOC caused constitutional violations, further demonstrating deliberate

20    indifference to the risks and harm Plaintiff suffered.

21    428.    Defendants Caesars and FLVOC are liable for failing to implement adequate

22    policies and training to prevent wrongful trespass notices.

54

429.    Due to these policy failures, John Doe issued unlawful trespass notices in a

reckless manner, demonstrating deliberate indifference to Plaintiff's liberty interests.

430.    The misconduct described in this Count was objectively unreasonable,

intentional, and intended to cause harm.

431.    As a result of Defendants' misconduct, Plaintiff suffered loss of liberty, public

stigma, reputational harm, emotional distress, and other ongoing injuries.

432.    As a direct and proximate result of the conspiracy between Defendant

detectives and Flamingo employees, Plaintiff has suffered and continues to suffer

damages, the full extent of which will be proven.


**SEVENTH COUNT**

**Equal Protection Violation (Class of One)**

42 U.S.C. § 1983 – Fourteenth Amendment

*(Against Metro, Detective Gabriel Lea. Detective Brooks West, Caesars*

*Entertainment, Inc., and Flamingo Las Vegas Operating Company, LLC)*

433.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

434.    At all relevant times, Defendants Lea and West, acting under color of state

law, engaged in conduct that deprived Plaintiff of his constitutional rights under the

Fourteenth Amendment by arbitrarily enforcing the law, in violation of Equal

Protection.

435.    Plaintiff was arbitrarily and irrationally singled out while engaging in routine,

lawful gambling, identical to the conduct of all other casino patrons.

436.     Despite being similarly situated to these other gamblers, Plaintiff alone was detained, arrested, and prosecuted without any legitimate basis, demonstrating a blatant departure from standard enforcement practices.

437.     No other gamblers in the Flamingo, who were similarly situated to the plaintiff were subjected to search and seizure, handcuffing, 30 hours of detention or criminal charge.

438.     Defendant Lea's inquiry to the John Doe—asking whether Plaintiff was a regular player or personally known to the employees—was entirely irrelevant to determining whether a crime had occurred, as neither status would make otherwise unlawful conduct permissible.

439.     Yet, upon receiving negative responses to both questions, Lea proceeded with the arrest, revealing that Plaintiff's unfamiliarity to casino employees—not any evidence of criminal conduct—served as the true basis for the enforcement action.

440.     Defendant Lea's action demonstrates the arbitrary and irrational basis for the arrest.

441.     The act of checking machines before playing is a routine practice most casino patrons follow.

442.     If Plaintiff inadvertently inserted his TITO voucher into a machine with small leftover credits, this was not an offense but rather a common occurrence.

443.     No other player in Nevada has been arrested or prosecuted for similar conduct.

444.     Defendant Lea deliberately misrepresented Plaintiff's actions to justify an unjustified arrest.

445.    Due to the policy failures of Caesars and FLVOC, John Doe unlawfully or discriminatorily issued a trespass notice against Plaintiff, depriving him of liberty while similarly situated gamblers were not subjected to the same treatment.

446.    Acting under color of state law, Flamingo employees violated Plaintiff's right to equal protection by arbitrarily causing his wrongful arrest through deliberate or reckless disregard of exonerating evidence, such as surveillance footage.

447.    The Equal Protection Clause requires the state to act based on legitimate government interests.

448.    Here, the state had no legitimate interest in singling out Plaintiff for enforcement, as there was no rational basis for doing so.

449.    This lack of justification underscores the arbitrary and irrational nature of the enforcement.

450.    Flamingo employees acted under color of law by willfully participating in the violation of Plaintiff's right to Equal Protection under the law.

451.    The defendants' actions denied Plaintiff the Equal Protection guaranteed by the Fourteenth Amendment, which safeguards against arbitrary enforcement of the law.

452.    The misconduct described in this count was objectively unreasonable, intentional, and intended to cause harm.

453.    As a direct and proximate result of the violation of Plaintiff's equal protection rights under the "class of one" theory, Plaintiff has suffered and continues to endure damages, including emotional distress, reputational harm, loss of liberty, and ongoing public stigma, all of which will be proven.

57

**EIGHTH COUNT**

**Excessive Force**

**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**

*(Against Metro, Detective Lea, and Detective West)*

454.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

455.    Defendant detectives Lea and West, acting under color of state law and within the scope of their Metro employment, used excessive force in violation of Plaintiff's Fourth Amendment rights.

456.    Plaintiff, visibly unarmed and non-threatening, was approached at a slot machine by both defendant detectives, who were displaying full official authority.

457.    Within seconds, Defendant West grabbed Plaintiff's arm, led him about six feet away, and handcuffed him without resistance, flight risk, or any threat to safety.

458.    Despite Plaintiff's full compliance, the defendant detectives handcuffed him in the middle of the casino, subjecting him to unnecessary public humiliation and reinforcing the excessive nature of the force applied.

459.    They lacked any information that Plaintiff was armed or dangerous and acted solely on suspicion of a TITO ticket offense—an amount they deliberately withheld to manufacture a false pretext of a severe crime.

460.    The handcuffing was objectively unreasonable and disproportionate to the alleged offense, violating the Fourth Amendment's limitation on police use of force.

461.    Defendant detectives acted with malice and without lawful justification, directly causing Plaintiff's harm.

462.     Metro is liable for its longstanding practice of excessive force in Terry stops, particularly through unlawful handcuffing targeting Black individuals in Las Vegas Boulevard casinos.

463.     Upon information and belief, despite prior findings of liability, Metro failed to implement adequate supervision and training as corrective measures.

464.     Metro's failure to adequately train and supervise officers on lawful handcuffing constitutes deliberate indifference to Plaintiff's constitutional rights. As a direct and proximate result of this excessive force, Plaintiff has suffered and continues to endure damages, including reputational harm, loss of liberty, humiliation, emotional distress, and public stigma, all of which will be proven.


**NINTH COUNT**

**Failure to Intervene**

**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**

*(Against Detective Brooks West)*

465.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

466.     Detective West, acting under color of state law and within the scope of his Metro employment, had an opportunity to intervene but failed to prevent violations of Plaintiff's constitutional rights.

467.     Defendant West was aware of Detective Lea's fabrication of evidence to manufacture probable cause for Plaintiff's arrest and wrongful criminal charge.

468.     Defendant West directly participated in Plaintiff's unlawful handcuffing and detention, giving him actual knowledge of the constitutional violations.

469.     Despite having the opportunity to intervene, Defendant West took no action to prevent the submission of deliberately fabricated evidence in the form of a perjured affidavit, which was intended to harm Plaintiff.

470.     Defendant West's failure to intervene was objectively unreasonable and committed intentionally, with reckless disregard and deliberate indifference to the rights of others.

471.     Both Defendants, Detectives Lea and West, acted under color of state law and within the scope of their Metro employment.

472.     As a direct and proximate result of Defendant West's failure to intervene, Plaintiff has suffered and continues to suffer damages, including loss of liberty, reputational harm, humiliation, emotional distress, and public stigma, in an amount to be proven.

**TENTH COUNT**

**Defamation Per Se – Nevada State Law**

*(Against Metro, Detectives Gabriel Lea, Detective Brooks West, Caesars Entertainment, Inc., and Flamingo Las Vegas Operating Company, LLC)*

473.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

474.     As detailed above, Defendants Lea and West, acting independently, jointly, in conspiracy, or in some combination thereof with Flamingo employees, acted with malice and reckless disregard for the truth, causing Plaintiff defamation per se in violation of Nevada civil defamation law.

475.     This misconduct was the actual and proximate cause of Plaintiff's damages.

476.    Without reasonable justification, Defendant Detectives Lea and West handcuffed Plaintiff on the casino floor, in full view of other patrons.

477.    This handcuffing was objectively unreasonable and violated the Fourth Amendment of the U.S. Constitution.

478.    Then, Defendant Detectives escorted Plaintiff in handcuffs through the casino, implying an imputation of a crime by falsely suggesting criminal activity in front of other guests, which defamed Plaintiff and constituted slander per se under Nevada law.

479.    Defendant Lea's statement to Plaintiff, "Tonight, you are going to jail," made in the presence of others, further defamed Plaintiff. This public statement, communicated to third parties, lowered Plaintiff in the estimation of the community and subjected him to contempt.

480.    The words and conduct of Defendant Detectives are capable of a defamatory construction, as their pantomime—demonstrated by handcuffing Plaintiff—imputes criminal conduct to him, in violation of Nevada slander per se law.

481.    The imputation of criminal activity, conveyed through words or pantomime, constitutes slander per se and was communicated to a third party.

482.    The combination of their words and actions together constitutes slander per se as it would impute, to a reasonable person, that that Plaintiff committed a crime or is a criminal.

483.    The defendant detectives' actions falsely imputed criminal conduct to Plaintiff.

484.    Defendant Detectives, deliberately sought to defame Plaintiff, intending to cause harm.

485.     Defendant Detectives also falsely told Flamingo employees that Plaintiff had no money other than the stolen vouchers, with reckless disregard for the truth, causing further harm and constituting slander per se.

486.     Defendants Lea and West acted under color of state law during the course of their official duties and within the scope of their employment with Metro.

487.     Under respondeat superior, Metro is liable for all torts committed by its employees and is directly responsible for policies, practices, and customs that enabled or failed to prevent these wrongful acts.

488.     John Doe, the Assistant Security Shift Manager, told Plaintiff he was not welcome at the Flamingo and would be arrested if he returned.

489.     He also said, "I don't understand why Harrah's would want someone like you," while Defendant Detectives listened, then told them, "It's up to you guys," implying they could arrest Plaintiff.

490.     He made derogatory statements that lowered Plaintiff's estimation of the community, subjected him to contempt, and falsely implied criminal conduct, which were communicated to a third party.

491.     He, acting discriminately and unlawfully, issued an unwarranted trespass notice to Plaintiff an exaggerated action that constituted slander per se.

492.     By imputing a crime to Plaintiff through both the trespass notice and his derogatory words, these actions were capable of a defamatory construction.

493.     These defamatory actions were communicated to the Defendant Detectives.

494.    He could have avoided defamation by issuing the notice and making his statements in a manner that would not have been heard by others, such as when no one else was around.

495.    The combination of his words and actions together constitutes slander per se as it would impute, to a reasonable person, that Plaintiff committed a crime or is a criminal.

496.    He succeeded in inflicting slander per se on the Plaintiff, as his defamatory statements and actions directly contributed to the Plaintiff's defamation per se, arrest, and criminal charge.

497.    John Doe acted with malice, intentionally instigating Plaintiff's arrest by falsely portraying criminal conduct.

498.    He knowingly made defamatory statements to Plaintiff in the presence of Defendant Detectives, ensuring the communication was heard and acted upon.

499.    Both Caesars and FLVOC are liable for all state law torts committed by their employees under Nevada's doctrine of respondeat superior, as these actions were taken during the course of their official duties within the scope of their employment.

500.    The defendants' actions in this count were objectively unreasonable, intentional, and aimed at harming and defaming Plaintiff.

501.    As a direct and proximate result of the Defendants' slander per se, Plaintiff has suffered, and continues to suffer, damages, including loss of liberty, reputational harm, public stigma, and emotional distress, the full extent of which will be proven.

502.     Plaintiff seeks compensatory damages against all Defendants and punitive damages against Caesars and FLVOC, along with any other relief the Court deems just and proper.

**ELEVENTH COUNT**

**Premises Liability – Nevada State Law**

*(Against Caesars Entertainment, Inc. and Flamingo Las Vegas Operating Company, LLC (FLVOC))*

503.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

504.     Flamingo employees, including John Doe, owed Plaintiff a duty of reasonable care as an invitee, requiring them to protect Plaintiff from foreseeable harm, including harm caused by third parties like the defendant detectives.

505.     The employees breached this duty by recklessly disregarding the risk of harm, directly caused Plaintiff's unjust detention and wrongful criminal charge.

506.     Flamingo employees failed to exercise reasonable care to Plaintiff as an invitee.

507.     Instead, Flamingo employees provided a false pretext of criminal activity, creating conditions that directly led to Plaintiff's wrongful arrest.

508.     Flamingo employees knowingly ignored Plaintiff's play history, loyalty to Caesars, and his actions at the Flamingo on the day of his arrest.

509.     Despite access to surveillance video and other exonerating evidence, they deliberately disregarded the truth, acting with reckless disregard for Plaintiff's rights and safety.

510.     John Doe issued a trespass notice to Plaintiff in a discriminatory, or unlawful manner, with the intent to cause harm, timing it for the detectives to witness and implying they could arrest Plaintiff.

511.     He then told the detectives, "It's up to you guys," further encouraging the arrest.

512.     This gross negligence of Flamingo employees directly caused Plaintiff's harm.

513.     Plaintiff's actions were not criminal, and any reasonable person would recognize that someone with $3,147 in winnings had no incentive to walk through the casino collecting small vouchers.

514.     Flamingo employees' gross negligence foreseeably led to Plaintiff's injuries, including severe emotional distress, loss of liberty, public stigma, and other continuing damages.

515.     Given that Metro police had made multiple arrests at the Flamingo related to TITO ticket theft, the employees had actual or constructive knowledge that their actions would foreseeably lead to the wrongful conduct of the defendant detectives and cause harm to Plaintiff.

516.     The employees' failure to exercise due care directly caused the wrongful acts of the defendant detectives, resulting in harm to Plaintiff.

517.     The actions and inactions of the Flamingo employees described in this count were objectively unreasonable and intended to cause harm.

518.     Caesars and FLVOC failed to maintain a safe and non-misleading gaming environment by adequately train their employees to accurately report surveillance

footage to law enforcement and by intentionally or recklessly misrepresenting the nature of Plaintiff's conduct, creating a false pretext for criminal action.

519.    Both Caesars and FLVOC are liable for all state law torts committed by their employees under Nevada's doctrine of respondeat superior, as these actions were taken during the course of their official duties within the scope of their employment.

520.    Additionally, they are responsible for their failure to implement adequate policies, practices, and customs that enabled or contributed to these wrongful acts.

521.    As a direct and proximate cause of defendant's actions, Plaintiff has suffered and continues to suffer significant harm, including but not limited to emotional distress, reputational damage, financial losses, and other injuries as described above.

522.    Plaintiff seeks compensatory and punitive damages, along with any other relief the Court deems just and proper.

**TWELFTH COUNT**

**Intentional Infliction of Emotional Distress – Nevada State Law**

*(Against Metro, Detectives Gabriel Lea and Brooks West, Caesars Entertainment, Inc., and Flamingo Las Vegas Operating Company, LLC)*

523.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

524.    Defendants Metro, Lea, and West, acting independently, jointly, and/or in concert with Flamingo employees, engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard for causing, Plaintiff severe emotional distress. As a direct result of their actions and inactions, Plaintiff suffered severe emotional distress.

525.     Defendants' egregious misconduct—including the deliberate falsification of statements and causing Plaintiff's placement in the "Order Out Corridor"—was so extreme and outrageous that it shocks the conscience, exceeds all bounds of decency, and is utterly intolerable in a civilized society.

526.     Defendants acted with malice, oppression, and fraud, knowingly falsifying statements that led to Plaintiff's wrongful misclassification as a repeat, chronic offender among drug-related offenders.

527.     This designation, especially due to its strong association with drug offenders, has created a significant threat to Plaintiff's livelihood and reputation.

528.     The continued exposure of Plaintiff's name in these contexts has only intensified the stigma Plaintiff endures.

529.     As a result, Plaintiff has been relentlessly pursued by a federal law enforcement, causing him extreme hardship and severe emotional distress.

530.     If the plaintiff had not been included on the chronic criminal list, which is primarily for drug and prostitution offenders, he would not have suffered extreme emotional distress.

531.     The inclusion on this list caused the plaintiff severe emotional distress.

532.     Defendants Lea and West acted under color of law during the course of their official duties and within the scope of their employment with Metro.

533.     Under respondeat superior, Metro is liable for all torts committed by its employees and is directly responsible for policies, practices, and customs that enabled or failed to prevent these wrongful acts.

534.     Flamingo employees acted during the course of their official duties within the scope of their employment.

535.     Caesars and FLVOC are vicariously liable under respondeat superior and directly liable for policies, practices, and customs that contributed to or failed to prevent these wrongful acts.

536.    As a direct and proximate cause of Defendants' actions, Plaintiff suffered loss of liberty, significant reputational harm, severe public stigma, embarrassment, humiliation, and extreme emotional distress, including mental anguish, depression, anxiety, and prolonged loss of sleep, the extent of which will be proven.

**THIRTEENTH COUNT**

**Civil Conspiracy – Under Nevada State law**

*(Against Metro, Detectives Gabriel Lea, Detective Brooks West, Caesars Entertainment, Inc., and Flamingo Las Vegas Operating Company, LLC)*

537.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

538.     As set forth above, Defendants Lea and West, acting in concert with Flamingo employees, both known and unknown, as co-conspirators, conspired with the intent to accomplish an unlawful objective to harm Plaintiff, causing him significant damage.

539.     Defendants Lea, West and Flamingo employees agreed to investigate and cause the arrest and criminal charge of Plaintiff for a crime he did not commit, taking overt actions in furtherance of that agreement.

540.     In furtherance of the conspiracy, Defendant Lea and John Doe committed overt acts and were willful participants in the joint activity.

541.    The conduct of Flamingo employees occurred within the course and scope of their employment with the Flamingo.

542.    Both Caesars and FLVOC are liable for all state law torts committed by their employees under Nevada's doctrine of respondeat superior, as these actions were taken during the course of their official duties within the scope of their employment.

543.    Additionally, they are responsible for their failure to implement adequate policies, practices, and customs that enabled or contributed to these wrongful acts.

544.    Defendants Lea and West were acting under color of law during the course of their official duties and within the scope of their employment when they took these actions.

545.    Under the doctrine of respondeat superior, Defendant Metro is liable as a principal for all torts committed by its employees or agents, including the misconduct of the Defendant detectives described in this Count.

546.    As a direct and proximate cause of Defendants' actions, Plaintiff's rights were violated, resulting in injuries and damages, including but not limited to severe public stigma, extreme emotional distress, loss of liberty, and continuing harm, all of which will be proven.


**FOURTEENTH COUNT**

**False Arrest – Nevada State Law**

*(Against Metro, Detective Gabriel Lea, and Detective Brooks West)*

547.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

548.    At all relevant times, Defendants Lea and West acted under the color of state law as peace officers under Metro.

549.    In the course and scope of their official duties, Defendant detectives Lea and West falsely arrested plaintiff without probable cause.

550.    Defendant Lea deliberately falsified statements to manufacture probable cause.

551.    The actions and omissions of both detectives directly contributed to Plaintiff's wrongful arrest.

552.    Through physical force and a display of authority, Defendants handcuffed and restrained Plaintiff, causing him to reasonably believe he was not free to leave.

553.    Plaintiff submitted to their authority, was detained, arrested, and held in custody for 30 hours.

554.    The Defendant detectives intentionally exercised their governmental power to unlawfully restrict Plaintiff's liberty.

555.    The arrest was unlawful, without legal justification, and carried out with malice.

556.    Plaintiff did not knowingly or voluntarily consent to the arrest.

557.    Plaintiff was fully aware of his confinement.

558.    Defendants Lea and West acted in bad faith by targeting, stopping, handcuffing, detaining, and arresting Plaintiff, despite knowing no crime had been committed.

559.    Defendants Lea and West are liable for arresting Plaintiff without probable cause and deliberately fabricating false evidence to justify the arrest.

560.    The actions of the Defendant detectives were objectively unreasonable.

561.    Metro is liable because the misconduct of Defendants Lea and West resulted

from Metro's policies, practices, and customs, including inadequate supervision and

failure to train and discipline officers.

562.    Metro's failure directly caused the violation of Plaintiff's rights under Nevada

state law.

563.    As a direct and proximate cause of the false arrest, Plaintiff suffers injuries,

including financial loss, reputational damage, public stigma, and loss of liberty, and

continues to suffer, with the amount of damages to be proven.

**FIFTEENTH COUNT**

**Battery – Nevada State Law**

*(Against Metro, Detective Gabriel Lea, and Detective Brooks West)*

564.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

565.    At all relevant times, Defendants Lea and West acted under the color of state

law as peace officers under Metro.

566.    In the course and scope of their official duties, Defendant detectives Lea and

West unjustifiably handcuffed Plaintiff.

567.    Defendants Lea and West intentionally applied force to Plaintiff's body by

handcuffing him, without consent or lawful justification.

568.    As a direct result of Defendants' actions, Plaintiff suffered humiliation,

embarrassment, loss of liberty, loss of reputation, and emotional distress.

569.    Their actions in this count were objectively unreasonable and unjustified.

570.    Defendants' conduct constitutes battery under Nevada law, and Plaintiff is

entitled to damages for the injuries caused.

**PRAYER FOR RELIEF**

571.    Plaintiff respectfully prays the following relief:

**1- Monetary Relief**

572.    Plaintiff seeks compensatory and punitive damages in the amount of

**$12,500,000** for injuries sustained under 42 U.S.C. § 1983 for constitutional

violations and for Nevada state law claims.

573.    Any other relief the Court deems just and proper.

**2- Request for Expungement of Records**

574.    Plaintiff's Standing for Expungement Relief: It is well-settled that federal

courts have inherent equitable power to order the expungement of local arrest records

as an appropriate remedy in the wake of police action in violation of constitutional

rights.

575.    If the Court determines that Plaintiff's arrest was unconstitutional,

expungement is an appropriate form of relief.

Therefore, Plaintiff seeks the following relief under this prayer for relief:

576.    A- Declaratory Judgment: A declaration that Plaintiff's arrest was invalid

under the U.S. Constitution.

577.    B- Expungement Order: An order directing the expungement of all records related to Plaintiff's arrest from any criminal justice agency, public or private entity, or custodian of records in Nevada and nationwide, in accordance with NRS 179 and AB315_R1, which authorize expungement of all related records, including photographs, fingerprints, and biological evidence, to restore Plaintiff's rights and prevent further harm resulting from the wrongful arrest.

578.    C- Permanent Injunction: A permanent injunction prohibiting the dissemination or retention of Plaintiff's arrest records by any government or private entity.

579.    D- Further Relief: Any other relief the Court deems just and proper.

**3-  Request for Declaratory and Injunctive Relief Regarding NRS 465.070(3)**

580.    Plaintiff's Standing for Declaratory and Injunctive Relief: Plaintiff has standing under Article III of the U.S. Constitution because Glenn Maxwell Anderson, an attorney from the Clark County District Attorney's Office, stated in open court that Plaintiff could be arrested for pressing the cash-out button on a slot machine.

581.    This statement, made without providing specifics or relating it to NRS 465.070(3), establishes a credible threat of enforcement against lawful conduct.

582.    The Due Process Clause of the Fourteenth Amendment prohibits enforcement of vague statutes that fail to provide fair notice of what conduct is prohibited or that invite arbitrary and discriminatory enforcement.

583.    Therefore, Plaintiff seeks the following relief under this prayer for relief:

584.    A- Declaratory Relief: A declaration that NRS 465.070(3) is unconstitutionally vague as applied, as it does not provide fair notice of what constitutes a violation in the context of TITO-based gameplay.

585.    The statute lacks a meaningful definition of key elements necessary to determine a violation, including terms such as "attempt to collect, take, or claim" and "intent to defraud," leaving casino slot machine players including the plaintiff at risk of arbitrary and discriminatory enforcement.

586.    B- Injunctive Relief: An order immediately halting the enforcement of NRS 465.070(3) until the statute is amended to provide fair notice of what conduct is prohibited in the context of TITO-based gameplay.

587.    As currently written, the statute fails to provide an ordinary person with fair notice of prohibited conduct and allows for arbitrary or discriminatory enforcement, thereby violating due process.

588.    Therefore, Plaintiff respectfully requests that the Court enjoin its enforcement.

589.    C- Further Relief: Any other relief the Court deems just and proper to protect Plaintiff from unconstitutional prosecution.

**Plaintiff's Submission of Evidence in Support of Complaint**

590.    Plaintiff hereby attached the following exhibits, which are referenced in and central to the claims set forth in the Complaint:

- Exhibit 1: A copy of the Arrest Affidavit.
- Exhibit 2: A copy of the criminal charge.

- Exhibit 3: A copy of the court "Order Out Corridor."

- Exhibit 4: A copy of the court minute reflecting the dismissal of Plaintiff's criminal charge.

- Exhibit 5: A copy of the Clark County Jail property list issued upon Plaintiff's booking.

These exhibits are attached hereto as supporting evidence for the Plaintiff's claims.

### PLAINTIFF'S DEMAND FOR TRIAL BY JURY

591.    Plaintiff, Daniel Demissie, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

DATED this 1st day of April, 2025.                    Respectfully submitted,

Daniel Demissie

142 S Tennessee Ave, Apt 27

Atlantic City, NJ 08401

Telephone: 202-230-4537

Email: ddadconsult@yahoo.com

Pro Se Plaintiff